ERIC GRANT
United States Attorney
ARELIS M. CLEMENTE
JOSEPH D. BARTON
Assistant United States Attorneys
2500 Tulare Street, Suite 4401
Fresno, CA 93721
Telephone: (559) 497-4000
Facsimile: (559) 497-4099

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

RON COOK,

Defendant.

CASE NOS. 1:26-CR-00215-KES-EPG

GOVERNMENT'S BRIEF IN SUPPORT OF DEFENDANT'S PRETRIAL DETENTION

The government submits this brief in support of its argument that the defendant, Ron Cook, should be detained pending his trial in this case. The government believes that Mr. Cook's detention is warranted because he poses both a flight risk and a risk of obstructing justice that cannot be addressed by the proposed conditions of release.

In late 2024, Mr. Cook learned that there was an ongoing federal criminal investigation into him. Thereafter, he committed additional acts for fraud, identity theft, and money laundering as alleged in the Indictment. Moreover, one of the victims in this case filed a civil lawsuit against Mr. Cook and his company, Corporate America Lending ("CAL"), in 2024 in federal district court in Minnesota and was awarded approximately $58,000,000. In connection with that award, the district court appointed a receiver and prohibited Mr. Cook from opening any financial accounts for CAL without going through the receiver. Mr. Cook subsequently violated that order by opening an account ending 5181 in

CAL's name at the Banc of California in May 2025 without the receiver's knowledge. *See* Exs. 1-2. The account remained open for approximately one year until the bank learned about the receivership and closed the account on its own accord. Finally, in the civil lawsuit, the district court ordered Mr. Cook to file a declaration confirming that he had the funds available to satisfy the $58,000,000 award. Mr. Cook filed the declaration and the district court later found that he had deceived the court and that he did not actually have the funds available. *See* Ex. 3.

For these reasons, Mr. Cook cannot be trusted to follow court orders and should be detained.

Dated: November 3, 2026

ERIC GRANT
United States Attorney

By: */s/ Joseph Barton*
Arelis Clemente
Joseph Barton
Assistant United States Attorney

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Compeer Financial, ACA; Compeer Financial, PCA; and Compeer Financial FLCA,

Plaintiffs,

v.

Corporate America Lending, Inc.,

Defendant.

Civ. No. 24-1896 (JWB/ECW)

**ORDER**
**APPOINTING RECEIVER**

---

Chris Lovrien, Esq., David J. Feder, Esq., Joseph James Boylan, Esq., and W. Anders Folk, Esq., Jones Day, counsel for Plaintiffs.

Barry W. Lee, Esq,. Misa Eiritz, Esq., and Noro Mejlumyan, Esq., Manatt, Phelps & Phillips; Joseph T. Dixon, III, Esq., and Natasha T. Robinson, Esq., Fredrikson & Byron, P.A.; and Clarence Russell Georgeson, Esq., Georgeson Law Offices, counsel for Defendant.

---

This matter returned to federal court on a motion by Plaintiffs Compeer Financial, ACA; Compeer Financial, PCA; and Compeer Financial FLSA (collectively "Compeer") to confirm interim and partial final arbitration awards issued by the Merits Panel in AAA Case No. 01-24-0005-4234. (Doc. No. 76.) Defendant Corporate America Lending, Inc. ("CAL") also renewed its motion to dismiss for forum non conveniens. (Doc. No. 107.)

Based on the recommendation from the Merits Panel in its February 4, 2025 Partial Final Award on Phase I, the Parties were also ordered to submit additional materials regarding whether to appoint a receiver. (Doc. No. 97.) Compeer submitted a letter brief on the legal and factual basis for a receiver, a proposed order, and the names

and qualifications of two proposed receivers. (Doc. Nos. 100–102.) CAL responded with a letter in opposition and its own proposed order. (Doc. Nos. 110, 111.)

The Parties appeared for a hearing on all three matters on March 26, 2025, where the Court denied CAL's motion to dismiss, granted Compeer's motion to confirm, and found that a receiver was warranted, with the specific terms of the receivership to be entered separately. (Doc. No. 114.)

## ORDER

Having considered the parties' submissions, and for the reasons stated at the March 26, 2025 hearing, **IT IS HEREBY ORDERED** as follows:

1. The factual and legal basis for appointing a receiver are present, as detailed on the record at the March 26, 2025 hearing.

## APPOINTMENT OF RECEIVER

2. **Scott Avila** is appointed as the Receiver over the assets of Defendant Corporate America Lending, Inc. as described in this Order, and the authority granted to the Receiver is self-executing.

3. "Receivership Property" means the Payoff Proceeds, and any funds, accounts, or property into which those proceeds were deposited, transferred, or otherwise commingled, or which may be lawfully recovered in satisfaction of the arbitration awards confirmed by this Court. The Receiver shall have authority to investigate Defendant's finances for the limited purpose of identifying and recovering such assets.

4. "Payoff Proceeds" includes the $57,146,398.93 principal sum identified in the Merits Panel's February 4, 2025 award, together with all additional amounts awarded

to Plaintiffs by the Merits Panel, including (1) pre- and post-award interest at 10% per annum; (2) attorneys' fees and costs; and (3) sanctions or other monetary relief, all of which shall be deemed Receivership Property to the extent necessary to enforce the Merits Panel's final determinations.

5. Defendant and its current or former agents, representatives, and any entities in which Defendant holds an interest, and all employees, attorneys, agents, officers, directors, members, partners, and/or representatives thereof, including without limitation Ron Cook and Alex Aretakis, (i) must cooperate with the Receiver in the Receiver's performance of his duties by making themselves reasonably available to assist him as requested; (ii) take all necessary steps to comply with this Order and other orders of the Court, and with all applicable law and rules; and (iii) are enjoined from interfering with, secreting, removing, damaging or disabling the use, management, possession and control of Receivership Property. They shall make immediately available and turn over to the Receiver, if requested, all records concerning Defendant and the Receivership Property so that the Receiver may adequately account for any funds constituting Payoff Proceeds.

6. Upon the request of the Receiver, the United States Marshals Service or any state, county, or local policing authority, as the case may be, in any judicial district, is authorized assist the Receiver in carrying out his duties to take and secure possession, custody, and control of, or identify the location of, any assets, records or other materials that are Receivership Property under this Order.

7. Defendant and any third parties receiving notice of this Order shall surrender to the Receiver all Receivership Property, including any money held in

accounts maintained by Defendant at any financial institution.

8. All banks, commodity firms, brokerage firms, financial institutions, and other persons or entities, which have possession, custody, or control of any Receivership Property in Defendant's name that receive actual notice of this Order by personal service, electronic mail or otherwise are prohibited from:

a. Liquidating, selling, conveying, or otherwise transferring any Receivership Property, except upon instructions from the Receiver; or

b. Exercising any form of set-off, alleged set-off, lien, or any form of self-help whatsoever, or refusing to transfer any Receivership Property to the Receiver's control without the permission of this Court.

Further, all such institutions shall:

a. Within five (5) business days of receipt of notice, serve on the Receiver a certified statement setting forth, with respect to any such Receivership Property, the balance in the account or a description of the assets as of the close of business on the date that notice was received; and

b. Cooperate expeditiously in providing information and transferring Receivership Property to the Receiver at his direction.

**AUTHORITY OF RECEIVER**

9. Immediately upon entry of this Order, and continuing until expiration or termination of the receivership, the Receiver shall have all powers, authorities, rights and privileges heretofore possessed by Defendant's officers, directors, managers and shareholders under applicable state and federal law, by the governing charters, by-laws,

articles, or entity operating agreements, in addition to all powers and authority of a Receiver at equity, and all powers conferred upon a receiver by the provisions of 28 U.S.C. §§ 754, 959, and 1692, and Federal Rule of Civil Procedure 66. The Receiver is authorized, in the exercise of his discretion and subject to the control of this Court, to perform all acts necessary for the proper and lawful conduct of the receivership under all powers conferred upon a receiver under those provisions. Without limiting the foregoing, the Receiver may, in his discretion:

a. Take any and all actions the Receiver deems reasonable and appropriate to prevent waste of Receivership Property and to preserve, secure, manage, maintain, and safeguard Receivership Property;

b. Access Defendant's books and records with respect to operation of the Defendant and other property subject to this Order, but shall share access to those records with Defendant as needed;

c. Take and have complete and exclusive control and possession of Defendant's assets, including deposit accounts, commodity accounts, brokerage accounts, accounts receivable, or any other similar accounts comprising Receivership Property, including any held at any financial or other institution, and this Order shall constitute direction to any such institution(s) to grant the Receiver full access to all such accounts;

d. Investigate Defendant's financial records and account information to identify, locate, and segregate the Payoff Proceeds from Defendant's other assets. The Receiver shall have full authority to access and review all of

Defendant's books, records, and financial systems as necessary to identify, trace, and recover the Payoff Proceeds and enforce the Merits Panel awards. Plaintiffs may request access to such records through the Receiver. If the Receiver declines to share specific information, Plaintiffs may seek Court approval to compel such access, which may be referred to the Magistrate Judge as appropriate. The Receiver must comply with orders of the Court and Merits Panel to produce documents to the parties;

e. Deliver all amounts awarded by the Merits Panel and entered by this Court, including the Payoff Proceeds, once segregated from Defendant's other assets, to Plaintiffs as required by the Merits Panel and this Court;

f. Have authority to employ and pay such competent professionals to represent or assist the Receiver in carrying out his duties. The Receiver must file with the Magistrate Judge a request to approve the retention that includes the proposed compensation and discloses any potential conflicts of interest. Any party in interest may file an opposition to a retention request within 14 days after the request. The Receiver and any professional retained by the Receiver shall be paid by the Receiver from the Receivership Property in the same manner as other expenses of administration and without separate orders, but subject to the procedures, safeguards, and reporting that the Court may order;

g. Communicate with or serve this Order upon any person, entity, or government office that he deems appropriate to inform them of the status of

this matter or the financial condition of the Receivership Property. All government offices which maintain public files of security interests in personal property shall, consistent with such office's applicable procedures, record this Order upon the Receiver's request. Any person or entity that receives a copy of this Order by hand delivery, mail, email, or any other means, shall have notice of this Order and be bound by its terms; and

h. Issue subpoenas from any state or federal court for the purposes of carrying out the rights and duties set forth herein.

10. The Receiver shall act as a fiduciary for the Receivership Property and shall remain impartial. The Receiver shall not share records or materials with either party except in furtherance of the Receiver's duties under this Order. In the event of a dispute over disclosure or privilege, the Receiver shall seek direction from the Court.

**MISCELLANEOUS PROVISIONS**

11. **Reporting and Review.** Beginning 30 days from the date of this Order, and then every 60 days until discharge, the Receiver shall provide a written report to the Court, the Merits Panel, and the Parties to this action regarding the findings of its investigation, the performance of its rights and duties as set forth in this Order, and the progress of the receivership. The Court shall assess the Receiver's scope and authority upon receiving each report.

12. **Access to Privileged Information.** Nothing in this Order shall be construed to waive or abrogate the attorney-client privilege, work product doctrine, or other applicable protections. If the Receiver encounters documents or communications

that may be subject to such privileges, the Receiver shall refrain from review and promptly notify the Magistrate Judge for further instruction.

13. **Fees and Expenses.** The Receiver shall be compensated at the rate of **$850.00** per hour, which is the standard hourly rate for the Receiver. The Receiver shall also be reimbursed for reasonable business and travel expenses associated with the receivership. These fees and expenses are to be paid from the proceeds of the Receivership Property. Any objections to the Receiver's charged fees or expenses must be filed with the Magistrate Judge and served on the parties within fourteen (14) days of receiving the Receiver's statement. A hearing will be scheduled if necessary.

14. **Discharge.** The Receiver shall serve continuously until this Court terminates the receivership or appoints a substitute receiver. This Court will receive for approval an accounting of cash receipts and disbursements by the Receiver during his administration.

15. **Qualifications and Bond. Scott Avila** is qualified to serve as a Receiver and an officer of the Court. The Receiver shall post a bond in the amount of $100,000 within 14 business days of this Order, which may be reimbursed from Receivership Property. The appointment is effective immediately and shall not be delayed pending filing of the bond.

16. **Business Continuity Protection.** Nothing in this Order shall be construed to prohibit Defendant from continuing lawful business operations in the ordinary course of business, provided such operations are supervised by the Receiver and do not interfere with the segregation, recovery, or return of Receivership Property. The Receiver shall

permit such operations only to the extent they do not impair or frustrate the purposes of this Order.

Date: March 27, 2025

*s/ Jerry W. Blackwell*
JERRY W. BLACKWELL
United States District Judge

# EXHIBIT 2

BANC OF CALIFORNIA

## Terms and Conditions

Customer hereby agrees to the terms and conditions of this Master Account Agreement – Business Entities & Sole Proprietors ("Master Account Agreement") entered into with Banc of California ("Bank"). Customer further agrees to the terms and conditions governing the account(s) that are subject to this Master Account Agreement, including the Bank's Deposit Account Agreement and Disclosure, Rate Sheet, Schedule of Fees, Disclosure and Terms of Business Products and applicable account analysis terms and conditions, all incorporated herein by this reference and as amended by Bank from time to time. This includes, but is not limited to, Bank's ability to charge any Customer's account for applicable service fees. Customer acknowledges that it has received the aforementioned documents at the time Customer entered into this Master Account Agreement.

The individuals designated as "Contracting Officers" in Exhibit A below, and including all officers of Customer (each individually a "Contracting Officer" and collectively the "Contracting Officers") are authorized representatives of Customer and any such Contracting Officers are hereby authorized and empowered, whether acting together or individually, on behalf of Customer to acknowledge and agree to any and all account related agreements, including without limitation this Master Account Agreement, Bank's Deposit Account Agreement and Disclosure, and any deposit account service agreement, including cash management agreements (collectively "Customer Agreements"). Any one of the Contracting Officers shall be authorized to certify Customer resolutions.

The persons named as Authorized Signers in Exhibit A below (each individually an "Authorized Signer" and collectively the "Authorized Signers") are authorized (whether acting together or individually) to transact on accounts that are subject to this Master Account Agreement, and to perform the functions of an authorized signer as set forth in the Bank's Deposit Account Agreement and Disclosure. For the avoidance of doubt, "transact" on an account shall include all services made available by Bank in connection with an account, signing and indorsing checks, making deposits and withdrawals, initiating payment orders and otherwise using the account services that are provided by Bank.

Authorized Signers must include at least one Contracting Officer. Customer agrees that, as to each Authorized Signer : (i) Bank may rely on each Authorized Signer's signature provided on Exhibit A below (if signed with a wet ink signature), or any other signature of the Authorized Signer provided to Bank (including the signature on the Authorized Signer's driver's license or other government-issued identification card that is acceptable to the Bank; such driver's licenses and identification cards are referred to herein as "ID Cards", or a signature on a check presented to Bank), to verify checks, transactions, instructions, agreements, documents or other records (together "Records") that are purportedly signed by the Authorized Signer. Such signature is referred to herein as the Authorized Signer's "Signature Specimen" and Customer agrees the Signature Specimen is an accurate and true representation of the signature the Authorized Signer will use to sign Records. By signing below, each Authorized Signer agrees to Bank receiving the Authorized Signer's ID Card or an image of the ID Card, and keeping an image of the ID Card (including, without limitation, of the signature on the ID Card), if permitted under applicable law.

Customer agrees Bank may continue to rely on the authority granted to the Authorized Signers and Contracting Officers referenced herein until written notice of modification or revocation is received and accepted by Bank, and provided Bank has a reasonable opportunity to respond to such notice. Bank may rely upon any form of written notice, which it in good faith believes to be genuine or what it purports to be.

Bank shall be fully protected in relying on the authority granted to the Authorized Signers and Contracting Officers, as provided herein, and Customer agrees to indemnify Bank and hold Bank harmless from any claims, demands, expenses, loss, or damages resulting from, or arising out of, Bank's reliance on the authority referenced herein.

Customer is in compliance with all applicable federal, state, and local laws where the business was formed and operates. The information contained in this Master Account Agreement is true and correct.

Customer and Bank agree that the parties may electronically enter into agreements, including this Master Account Agreement. Both Customer and Bank agree not to contest the authorization for, or validity or enforceability of, electronic agreements, or the admissibility of copies thereof, under any applicable law. Agreements electronically "signed," if introduced as evidence on paper in any judicial or other proceedings, will be admissible to the same extent and under the same conditions as other documentary business records.

## Customer Agreement

By signing below (which may be represented in the form of an electronic signature), as a Contracting Officer on behalf of Customer, the undersigned hereby acknowledges receipt and acceptance of this Master Account Agreement and certifies that the authority of the undersigned to accept this Master Account Agreement on Customer's behalf has been granted pursuant to Customer's resolutions attached here as Exhibit B, or otherwise pursuant to resolutions acceptable to Bank which Customer agrees to make available to Bank upon request.

X [signature]
**Signature of Contracting Officer**

Ron J Cook
**Full Legal Name**

CEO
**Title**

5.29.25
**Date**

BANC OF CALIFORNIA

INTERNAL USE ONLY

## Accounts Established Under this Agreement

| Account Number | Account Type | Date Closed |
|---|---|---|
| 5848095181 | Business Checking Account | |
| 7816823972 | Business High Yield Savings Account | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☒ OFAC scans have been performed on all business entities and individuals listed on this Master Account Agreement.

## Supersedure

Supersedes Agreement Dated: ____________ Effective Date: ____________ Superseded by Agreement Dated: ____________

# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Compeer Financial, ACA; Compeer Financial, PCA; and Compeer Financial FLCA,

Plaintiffs,

v.

Corporate America Lending, Inc.,

Defendant.

Civ. No. 24-1896 (JWB/ECW)

**ORDER ON SHOW CAUSE RESPONSE**

---

The central issue of this inquiry is whether defense counsel misled the Court about what became of $58.1 million in loan payoff proceeds—millions of which had been dissipated by their client, Defendant Corporate America Lending, Inc. ("CAL"), while the lawyers were telling this Court that the funds remained available.

## I. Background

CAL is a California-based agricultural loan originator and servicer. On April 29, 2024, it received $58.1 million as a payoff for two loans in which Plaintiffs Compeer Financial, ACA; Compeer Financial, PCA; and Compeer Financial FLCA (collectively "Compeer") had purchased a 100% participation interest. Under the participation agreement, CAL was to notify Compeer and remit the funds upon receiving any payment.

CAL did neither on April 29. Instead, over the next week, its CEO transferred more than $35 million of the proceeds to other investors—requiring no collateral from them, no contracts, and no clear accountability for the funds. (*See* Doc. No. 80-5,

10/28/24 Interim Award at 3, 11–12; Doc. No. 80-7, 11/26/24 Sanctions Award at 4.)

As the funds were being diverted, CAL at the same time was misleading Compeer into believing the loans were still active and no payoff received. It fabricated receipt of a regular monthly loan payment from the borrower on May 2, 2024, as part of its effort to mislead Compeer about the existence of the April 29 payoff. (*See* Doc. No. 80-1, Phase I Award at 6–7; Doc. No. 2-5, Compl. Ex. 8 at 9; Doc. No. 9, Steele Aff. ¶¶ 16–17.). When Compeer suspected it was being misled and inquired about the payoff, CAL's COO—the same person who had signed the payoff instructions for receiving the $58.1 million just days earlier—said he knew nothing about it. (*See* Doc. Nos. 2-3, 2-6, Compl. Exs. 5, 9; Steele Aff. ¶ 18.) As contractually required, Compeer then initiated an emergency arbitration proceeding to recover the payoff funds.

The aforementioned events occurred before this Court's involvement. On May 21, 2024, Compeer filed suit and immediately sought an order requiring CAL to preserve or remit the payoff proceeds. On May 29, this Court held a conference to determine whether the funds could be sequestered while the emergency arbitration proceeded on the merits. What followed were oral representations from CAL's counsel and a declaration from its CEO which were revelatory for evading the most basic question: *where is the money?*

**A. Factual Findings**

The May 29 conference was convened for one reason: to learn the location and status of the payoff proceeds. The goal was to protect the integrity of the arbitration by ensuring the money remained intact and available for a possible award—action the emergency arbitrator would soon also order. It is now well known that at that time, CAL

had already received the $58.1 million loan payoff. (*See* Doc. No. 80-1, Phase I Award at 5–7.) It did not disclose the payoff as contractually required but instead sought to prevent Compeer from recovering the money. (*See id.*)

Addressing the status of the funds, CAL's litigation counsel Barry Lee assured this Court that "there should not be a concern about the availability of funds," while at the same time saying that he did not know where they were. (*See* Doc. No. 33, 5/29/24 Tr. at 8–10). To clear the matter up, this Court required an explanation from CAL to confirm whether the funds were available to be sequestered while the arbitration proceeded. (*See* Doc. No. 29.) Ron Cook, CAL's CEO, was identified as the company representative who could address the status of the money. (Doc. No. 133, Lee Decl. ¶ 21.) The conference would reconvene in the afternoon to hear from Cook on the status of the funds.

Before the conference was set to reconvene, local counsel filed a declaration from Cook stating that CAL had received the payoff and that he was "willing to enter an agreement that preserves" the funds.[1] (Doc. No. 30.) The declaration suggested both the intent and ability to preserve, which appeared genuine because Cook could not reasonably preserve funds the company did not control—and his lawyer had represented there should be no concerns. After reviewing Cook's declaration, this Court did not reconvene the conference but issued an order requiring CAL to preserve the funds in escrow. (Doc. No. 32 at 1–2.)

---

[1] The declaration was not signed by any attorney, even though a lawyer's signature is required on every filing. Fed. R. Civ. P. 11(a). Nonetheless, Lee attests that he and local counsel reviewed, edited, and approved Cook's declaration. (Lee Decl. ¶¶ 24–27.)

The truth that ultimately came to light was that these commitments and assurances were misleading. They cast CAL as willing to cooperate and able to preserve the funds until the dispute was resolved. But most of the money was already gone, and CAL then spent months keeping that fact hidden behind even more obfuscation and delay.

C. Russell Georgeson, Lee's co-counsel, did not attend the May 29 conference and was not involved with the Cook declaration. He became involved shortly after by giving updates on CAL's efforts to comply with the orders to preserve the funds issued by this Court and the emergency arbitrator. He and Lee told the emergency arbitrator and this Court in June 2024 that escrow accounts were being set up and the funds were being recovered. (*See* Doc. No. 134, Georgeson Decl. ¶¶ 26, 28; Doc. Nos. 38-2, 38-4, 38-6, 39). Later, at hearings before the emergency arbitrator and before this Court, Georgeson readily admitted his client had not complied with the preservation orders. (Georgeson Decl. ¶¶ 29, 34, 38; *see also* Doc. No. 57, 9/3/2024 Tr. at 7:22–9:21). His reports had given the impression that compliance was just days and weeks away. It plainly was not.

Georgeson also eventually received what was left of the payoff proceeds. In October, $23 million of the $58.1 million was placed in a trust account with his law firm, months after those funds had been represented as recovered and were ordered to have been escrowed. (Georgeson Decl. ¶ 5; Doc. No. 38-6, 6/13/24 Report ¶ 4.) Between this Court and the arbitrators, escrow of the proceeds had been ordered—and ignored—at least five times. (Doc. No. 80-7, 11/26/24 Sanctions Award at 4.) Georgeson, aware of the orders, still created no escrow arrangement.

**B. Counsel's Explanations**

Lee says he had no idea the payoff proceeds had been dissipated when he suggested to the Court at the May 29 conference that the funds were intact. (Lee Decl. ¶ 19.) He claims he was relying on what Cook had told him. (*Id.*) As for the misleading declaration submitted in Cook's name (but not signed by any attorney), Lee explains that it was drafted by Cook; reviewed, edited, and approved by Lee and local counsel; filed on short notice; and accurately reflected Cook's willingness to preserve the funds. (*Id.* ¶¶ 24–31.) He says his comments at the conference were cautious and in good faith. (*Id.* ¶¶ 4, 17.) He points to his later disclosures during arbitration as proof that he had no intent to mislead. (*Id.* ¶ 60.) He also advances the view that once this Court stayed the case and referred interim enforcement to the arbitration, he no longer bore responsibility to clarify any misstatements that may have been made. (*See id.* ¶ 73.)

Georgeson disclaims any part in the May 29 events. (Georgeson Decl. ¶¶ 15, 19.) He says he learned about the missing funds months later. (*Id.* ¶ 16.) Like Lee, he blames the client. (*Id.* ¶ 41.) He again concedes that the company failed to follow the Court's May 29 order to preserve the funds independently in escrow (i.e., away from either party's control) and the similar arbitral directives that followed. (*Id.* ¶ 12.) Yet he insists that all of his representations about his client's efforts to recall and preserve the funds were true when he made them. (*Id.* ¶ 26, 30, 33–34, 42.) He confirms receiving $23 million from Cook in October and placing those funds in a trust account in his law firm's name. (*Id.* ¶¶ 5, 13.) Instead of directly confronting the evasive noncompliance and his possible role in it, Georgeson points to the emergency arbitrator, who assigned blame to

CAL for being misleading, and not to the lawyers. (*Id.* ¶ 37).

## II. Discussion

### A. Legal Standards

The above circumstances implicate the duty of candor that all licensed attorneys owe to the judiciary. Minnesota Rule of Professional Conduct 3.3(a)(1) prohibits lawyers from knowingly making or failing to correct a false statement to a tribunal. Rule 3.3(a) prohibits offering evidence a lawyer knows to be false, and if a lawyer learns that material evidence (such as a client's sworn declaration) is false, the lawyer must take reasonable remedial measures. Rule 3.3(b) also requires remedial measures if a lawyer knows their client engaged in fraudulent conduct related to a proceeding. The Rules of Professional conduct in California—where Lee and Georgeson are based—impose the same obligations. *See* Cal. R. Prof. Conduct 3.3.

This District's Local Rules require that nonresident attorneys who are admitted pro hac vice—like Lee and Georgeson—must comply with the Minnesota Rules of Professional Conduct. *See* D. Minn. LR 83.6(a); *see also United States v. Gutierrez*, 351 F.3d 897, 902 (8th Cir. 2003). Both Lee and Georgeson signed affidavits acknowledging that they understood this requirement. (*See* Doc. No. 24 at 2; Doc. No. 42 at 2.)

### B. Analysis

#### 1. Preliminary arguments

As an initial matter, both attorneys argue that this Court's show cause order related to the present ruling lacked sufficient specificity. It did not. The order identified both the May 29, 2024 Cook declaration and the conference held that same day as the impetus for

the inquiry. Although Georgeson did not participate on May 29, his later actions were similarly evasive about the same matter of concern: the current status and need to preserve the payoff proceeds. The show cause order recited the factual context. And it told counsel what to explain. That is sufficient. The extensive record of evasiveness and misdirection—for which the arbitrators sanctioned their client, CAL—belie any claim for greater specificity.

Both lawyers also argue that this Court lacks authority to ask these questions. Once the case was referred to arbitration, they say, their responsibility shifted elsewhere. (*See* Lee Decl. ¶ 73; Georgeson Decl. ¶ 24.) Their argument implies that attorneys can violate their duty of candor (or other ethical obligations) so long as they "get out of town" before being called to account. That is not how professional obligations work. Lawyers are not free to flout their duties if a federal lawsuit is stayed pending arbitration. *See* Minn. R. Prof. Conduct 3.3, Comment [13] (obligation to rectify false information ends when final judgment has been affirmed on appeal or the time for review has passed); *see also* Cal. R. Prof. Conduct 3.3(c) (duties "continue to the conclusion of the proceeding"). Counsel's after-the-fact defenses, if accepted, would render Rule 3.3 practically meaningless.

Attorneys practicing before this Court are expected to speak with care and to correct the record when a representation proves inaccurate. That duty is heightened where the representation induces judicial reliance and potentially prejudices the administration of justice. It was especially critical here because, as this Court made clear, preserving the payoff proceeds would ensure the possibility of a meaningful end to contentious

litigation.

**2. Analysis of May 29 events**

As stated above, this inquiry focuses on whether counsel misled the Court about the payoff proceeds. While both attorneys contributed to the problem, Lee's statements had a more direct impact because they directly discussed the state of the money and immediately preceded Cook's declaration. Cook confirmed the $58.1 million payoff had been received and stated he was willing to enter a preservation agreement. His "nothing to see here" declaration was provided to answer the Court's questions about the location and status of the funds, implying that CAL still had the funds such that its CEO could be willing to preserve them. These selective statements actively concealed that the funds had already been dissipated by tens of millions.

Lee's oral assurances and Cook's declaration worked together to obscure the truth. The declaration said only that CAL had received the funds on April 29 and was "willing" to preserve them—without disclosing that tens of millions had already been transferred away. That omission did not happen in a vacuum. It followed directly on the heels of Lee's representation to this Court that "there should not be a concern about the availability of funds." That combination of vague language and misplaced reassurance gave the false impression that the money remained available and could be preserved as directed. The declaration avoided the one fact that mattered: whether CAL still had control of the funds. Counsel's statements served to hide that critical omission, misdirecting this Court at a pivotal moment and undermining the utility of a preservation order this Court believed could still protect the proceeds.

The misdirection was not Cook's alone. Lee reviewed, edited, and authorized a declaration that evaded the question of accounting for the status of the payoff proceeds. He offered this Court assurances while either admitting he had no basis for giving them or hedging that he may not have the latest information. And he did not take steps to correct his prior representation after learning what happened to the money.

Though this Court accepts at this time that Lee may not have knowingly misled it, his failure to verify the facts, failure to recognize the possible misleading effects of his statements, and failure to clarify the record as the truth emerged obscured critical facts that should have been made clear.

### 3. Analysis of events after May 29

Georgeson's involvement after May 29 reflected a similar evasiveness that warrants similar scrutiny. The chief concern is whether he sufficiently investigated the basis for his assurances that CAL and Cook were taking steps to retrieve and sequester the funds as ordered. *See* Minn. R. Prof. Conduct 3.3, Comment [3] (assertions on the lawyer's own knowledge may be made only when the lawyer knows the assertion is true or believes it to be true based on a reasonably diligent inquiry). Like Lee suggested at the May 29 conference that there should be no concern about the money, Georgeson's reports in June suggested CAL was actively pursuing compliance with the preservation orders.[2]

Georgeson's assurances became more suspect as CAL came no closer to complying in the weeks and months after his reports. Later, Georgeson readily admitted

---

[2] To the extent that Lee co-signed the reports and submissions, he was also responsible for their evasive effects.

to the arbitrators and to this Court that CAL had not complied with the preservation orders. Although Georgeson was commended at the time for these admissions, this Court will not overlook actors who disregard orders.

Georgeson's actions extended beyond his status reports; he eventually became more directly involved with the noncompliance. When he received a substantial portion of the missing money, he altogether ignored the orders to preserve the funds in escrow. Rather than comply, he kept the money in his law firm's trust account and then advocated for alternatives to the ordered arrangement. The law firm's trust account was hardly an appropriate escrow, and the preservation orders made that clear.

No trust agreement has been produced, and no evidence suggests that the funds were subject to third-party oversight. Georgeson, who retained his role as CAL's attorney, held the money in a manner that gave the appearance of independence without any reality of neutrality. The arrangement was not compliant and did not satisfy the need for meaningful custodial safeguards. Indeed, the funds apparently came from his client, CAL, with instructions and restrictions. (*See* Doc. No. 128, 3/26/25 Hrg. Tr. at 28:19–30:2; Doc. No. 110 at 1.) The funds were never fully severed from CAL's control and interests, despite that being this Court's stated objective from the start.

As compliance delays mounted and CAL's promises (through counsel) repeatedly failed to materialize, it became reasonable—indeed inescapable—to suspect, as the arbitrators did, that there was never any intent to comply. Georgeson's role in this timeline is troubling. Despite known concerns about CAL's evasiveness, he became the recipient of millions in dissipation-tainted funds, held them in a noncompliant account,

and argued against the very preservation mechanisms that had been ordered. Whether he saw himself as neutral observer or active facilitator is unclear. What is clear is this: Georgeson's conduct did not disrupt his client's defiance—it insulated it.

Though this Court does not find at this time that Georgeson knowingly misled the tribunal, his actions enabled his client's misconduct to continue, shielded from judicial scrutiny, in violation of court and arbitral orders.

## III. Conclusion

As stated in the show cause order, this is not yet a formal disciplinary matter but a serious threshold inquiry. Upon review of the relevant portions of the record and the parties' submissions, this inquiry will not be referred for formal disciplinary review. That decision reflects the limited nature of the inquiry, the lack of clear evidence of intentional dishonesty in the relevant materials, and deference to the arbitrators' decision to sanction CAL and Cook, not their lawyers, for evasive misconduct.

Attorneys are not hired guns. They are officers of the court, and that role carries obligations that go beyond zealous advocacy. Lawyers have a duty to safeguard the integrity of the judicial process, even when that duty cuts against the interest of their client. *See* Minn. R. Prof. Conduct 3.3, cmt. [2]; *see also United States v. Shaffer Equip. Co.*, 11 F.3d 450, 457–59 (4th Cir. 1993). Representations to this Court must rest on facts, truth, and diligence—not inference, assumption, or speculation—and must be corrected when later information proves them inaccurate. These duties do not end when jurisdiction shifts. They do not expire while the case is pending. They do not wait for someone else to speak up.

The conduct of Lee and Georgeson fell short. Both contributed to a record that misled this Court in a matter involving millions of dollars subject to preservation. They submitted or allowed vague, incomplete, and misleading representations and appearances to stand uncorrected. They failed to disclose what they had come to know—or should have come to know—about the true status of the funds. They maintained the appearance of cooperation while the money was vanishing or already gone, even as they were addressing this Court. And when the truth emerged, they allowed the misimpression to persist.

This cannot happen again. The conduct here is serious, and while this Court stops short of imposing formal sanctions at this time, counsel should not mistake restraint for indifference. Misrepresentations—whether by overstatement, omission, or inattention—undermine the trust courts must place in attorneys as officers of the court. If similar conduct repeats in these proceedings, counsel will not receive the same degree of leniency.

**SO ORDERED.**

Date: October 23, 2025

*s/ Jerry W. Blackwell*
JERRY W. BLACKWELL
United States District Judge